UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ERICA ADAMS                                    CIVIL ACTION

VERSUS                                         NO: 07-9720

CITY OF GRETNA                                 SECTION: R

<u>**ORDER AND REASONS**</u>

Before the Court is defendant City of Gretna's motion for
summary judgment.  For the following reasons, the Court GRANTS
the motion in part and DENIES it in part.


**I.    BACKGROUND**

This case arises out a series of actions that culminated in
the termination of plaintiff Erica Adams as an employee of
defendant City of Gretna.  On January 19, 2006, Ronnie Harris,
mayor of the City of Gretna, hired Adams as a full-time clerk for
the City's Recreation Department.  Between August of 2006 and
January of 2007, Donald Royal served as the Recreation
Superintendent for Gretna and was Adams's direct supervisor.
Jack Griffin, the Director of Public Works for Gretna, was
Royal's supervisor.

Adams alleges that beginning in August of 2006 pornographic "pop-ups" would appear on her work computer several times per day.  Although the source of the pop-ups was not apparent at the time, it later became clear that Royal had been viewing pornography on Adams's computer.  Adams alleges that she complained to Griffin about the pornography in late November of 2006 but that nothing was done about it at the time.

In late December of 2006, Adams discovered a black plastic bag on a shelf in her office containing pornographic DVDs and personal financial materials belonging to Royal.  Subsequently, Adams complained to Griffin about the materials and indicated that she believed it belonged to Royal.  She also reported her suspicion that Royal had been viewing pornography on Recreation Department computers, including her own.  Griffin and Mayor Harris confronted Royal about Adams's complaint, and Royal admitted to viewing pornography on a department computer.  Royal was then given the option to resign or be terminated.  He chose to resign and his employment accordingly ended on January 5, 2007.

On January 10, 2007, Griffin and Mayor Harris met with Adams to discuss the outcome of Adams's complaint about Royal.  Adams alleges that Mayor Harris scolded her at this meeting for complaining about Royal.  According to Adams, Mayor Harris told her she "should have been a big girl and should have dealt with

it [herself]" and asked if she "was happy with the outcome, because this is not what [he] wanted." Adams Depo. at 234.

Following Royal's resignation, Griffin asked another City employee, Andy McMenamin, to keep an eye on the Recreation Department while the City tried to refill the Recreation Superintendent position vacated by Royal. Adams alleges that "McMenamin would come and just sit in [her] office and stare and follow [her] around" and that he would "call quite frequently to know [her] whereabouts." Adams Depo. at 216-18.

On January 24, 2007, Adams applied for the Recreation Superintendent position vacated by Royal. Adams advanced to the second round of interviews but was not selected for the position. On March 1, 2007, Griffin gave Adams a letter of termination, effective immediately. Later that same day, police officers escorted Adams to the Gretna Community Center to collect her belongings. Adams claims that armed police officers escorted her "out of the building in front of everyone" and that the police escorted her vehicle to the community center, "through the city," in the rain, "with their [siren] lights on." Adams Depo. at 141. She asserts that "everybody who was on lunch break saw this." *Id.*

On April 16, 2007, Adams filed a charge with the Equal Employment Opportunity Commission alleging unlawful discrimination based on race and sex and unlawful retaliation.

On October 4, 2007, the Department of Justice mailed Adams a Notice of Right to Sue Within 90 Days. On December 20, 2007, Adams filed a complaint in this Court, asserting claims for sexual harassment, unlawful retaliation, and deprivation of liberty without due process of law. Gretna has moved for summary judgment on all of these claims. The Court held a pre-trial conference on June 9, 2009, at which the parties clarified some of the issues now before the Court. For the reasons assigned at that conference, the Court ordered that the trial date in this matter be continued. The Court now rules on Gretna's motion as follows.

## II. LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that

-4-

there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

### III. DISCUSSION

Adams has challenged her treatment and discharge on three separate grounds. First, she claims that her work situation amounted to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. Second, she claims that Gretna unlawfully retaliated against her for engaging in activity protected by Title VII. Third, she claims that Gretna deprived her of liberty without due process of law. Gretna has moved for summary judgment as to each of these grounds, arguing that Adams cannot establish one or more of the essential elements of each

claim.  The Court also notes that it originally appeared that
Adams meant to assert a separate disparate treatment claim based
on Gretna's failure to promote her following Donald Royal's
resignation.  Adams's counsel represented at the June 9, 2009
pre-trial conference that Adams is not pursuing that claim, and
the Court therefore does not address it.

### A.    Hostile Work Environment

Title VII of the Civil Rights Act of 1964 provides in
relevant part that "[i]t shall be an unlawful employment practice
for an employer to ... discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's ... sex."  42 U.S.C.
§ 2000e-2(a)(1).  Courts have long recognized that this language
"is not limited to 'economic' or 'tangible' discrimination," such
as discrimination in hiring and compensation.  *Meritor Savings
Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  Title VII is also
violated "[w]hen the workplace is permeated with discriminatory
intimidation, ridicule, and insult that is sufficiently severe or
pervasive to alter the conditions of the victim's employment and
create an abusive working environment."  *Harris v. Forklift
Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks
and citations omitted).

The Supreme Court has distinguished between cases in which a

hostile work environment is created by the plaintiff's co-workers and cases in which the hostile work environment is created by the plaintiff's supervisor. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 n.4 (5th Cir. 2008). When co-workers are to blame, the employer can be held liable only if it "knew or should have known of the harassment and failed to take prompt remedial action." *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005). By contrast, when the plaintiff's supervisor is responsible, the employer can be held liable vicariously liable for the supervisor's actions without any showing that the employer was personally negligent. *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

Here, Adams has alleged that her direct supervisor, Donald Royal, created a hostile work environment by viewing pornography on Adams's computer; by downloading software to Adams's computer that caused pornographic "pop-ups" to appear on the screen while Adams was working; by masturbating in Adams's office while Adams was not there and leaving a suspicious towel on the floor of the office; and by leaving a bag full of pornographic DVDs in Adams's office. To prevail on this claim, Adams must establish four elements:

(1) She is a member of a protected group;

-7-

(2)    She was the victim of uninvited sexual harassment;

    (3)    The harassment was based on sex; and

    (4)    The harassment affected a term, condition, or privilege
           of her employment.

*Aryain*, 534 F.3d at 479.

Gretna does not dispute that Adams is a member of a

protected group.  *See* R. Doc. 32 at 3.  Gretna briefly states

that Adams cannot show that the harassment was uninvited or based

on sex, *see* R. Doc. 25-3 at 13, but it does not explain the basis

for this statement, and it is not obvious why the presence of

unsolicited pornography on Adams's computer would not satisfy

these two elements.  The Court has no way of assessing whether

summary judgment is warranted as to these two elements, and it

therefore declines to address them.  *See Celotex*, 477 U.S. at 323

("[A] party seeking summary judgment always bears the initial

responsibility of informing the district court of the basis for

its motion, and identifying those portions of the [record] which

it believes demonstrate the absence of a genuine issue of

material fact."); *see also Russ v. International Paper Co.*, 943

F.2d 589, 591-92 (5th Cir. 1991).

The only question properly before the Court is whether

Royal's actions were "sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive

working environment."  *Harris*, 510 U.S. at 21.  Under this

standard, the environment must be "both objectively and

subjectively offensive, one that a reasonable person would find
hostile or abusive, and one that the victim in fact did perceive
to be so." *Faragher*, 524 U.S. at 786. Gretna does make any
argument with respect to the subjective offensiveness of Adams's
work environment, so the Court will address only the objective
component. To determine whether the harassment was severe or
pervasive, the Court "must look to the totality of the
circumstances, including the frequency of the discriminatory
conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; whether it
unreasonably interferes with an employee's work performance; and
whether [it] undermined the plaintiff's workplace competence."
*Lauderdale v. Texas Dept. of Criminal Justice*, 512 F.3d 157, 163
(5th Cir. 2007) (quoting *Harris*, 510 U.S. at 23, and *Butler v.
Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 270 (5th Cir. 1998))
(internal citations and quotation marks omitted). The Fifth
Circuit has emphasized that the "severe or pervasive" standard is
disjunctive, *Harvill*, 433 F.3d at 434-35, and that "the required
showing of severity or seriousness of the harassing conduct
varies inversely with the pervasiveness or frequency of the
conduct," *Lauderdale*, 512 F.3d at 163 (quoting *Ellison v. Brady*,
924 F.2d 872, 878 (9th Cir. 1991)).

Applying these standards to the facts of this case, the
Court finds that a reasonable jury could conclude that the

harassment in question affected a term, condition, or privilege of Adams's employment. Adams testified that she would see pornography on her computer "[a]t least three to four, if not five times a day every day" and "[s]ometimes more than that" over a period of four or five months.[1] Adams Depo. at 178, 180. In addition, Adams discovered a bag of Royal's pornographic DVDs in her office. Adams has also suggested that Royal once masturbated in her office when she was not there. Although she has no direct knowledge that this conduct occurred, she testified that when she walked into her office that day "[her] computer screen was turned -- the volume was all the way up and the floor was wet and the wet towel was ... underneath [her] desk." *See* Adams Depo. at 178; *see also id.* at 181 ("Well, it wasn't raining. He wasn't working on the field. There is porn on my computer, so one can only imagine what he was doing at my desk with a wet floor and a wet towel and everything wet.").

A number of courts have concluded that the "the mere presence of pornography in a workplace can alter the 'status' of

---

[1] There is some confusion in the record about when the pornography began to appear. Adams alleged in her complaint that she "found pornographic websites on the computer in her office" on November 20, 2006. Compl., R. Doc. 1 at ¶ 3. She does not mention any earlier encounters with pornography. In her deposition, however, she testified that she "started seeing the porn ... [a]nywhere from August up until the time I was terminated. August, September." Adams Depo. at 178. Because the earlier date is the only date supported by competent summary judgment evidence, the Court will treat that date as the alleged start date for purposes of the present motion.

women therein and is relevant to assessing the objective hostility of the environment." *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) (per curiam); *see also Waltman v. Int'l Paper Co.*, 875 F.2d 468, 478 (5th Cir. 1989); *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 438-39 (N.D.N.Y. 2009); *Avery v. Idleaire Technologies Corp.*, No. 04-312, 2007 WL 1574269, at *18 (M.D. Tenn. May 29, 2007); *Greene v. A. Duie Pyle, Inc.*, 371 F. Supp. 2d 759, 763 (D. Md. 2005). Indeed, Judge Richard Posner has suggested that pornography in the workplace is more closely analogous to unsolicited touching than to sexual banter:

> Drawing the line [between actionable harassment and mere vulgarity] is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Baskerville v. Culligan Intern. Co.*, 50 F.3d 428 (7th Cir. 1995).

Although most cases involving pornography in the workplace include other elements such as threatening or offensive remarks, *see, e.g.*, *Waltman*, 875 F.2d at 471, there is no necessary reason why the presence of pornography alone could not create a hostile work environment so long as the pornography was sufficiently severe or pervasive. The Fifth Circuit's decision in *Lauderdale v. Texas Dept. of Criminal Justice*, 512 F.3d 157 (5th Cir. 2007), is instructive on this point. The plaintiff in that case presented evidence that her supervisor had attempted to pursue an

-11-

amorous relationship with her.  *See Lauderdale*, 512 F.3d at 161-

62 (describing supervisor's phone calls to the plaintiff,

suggestion that the two of them travel to Las Vegas and

"snuggle," and other attempts to win the plaintiff's affections).

Noting the relatively innocuous nature of the supervisor's

advances, the Fifth Circuit held that "none of the incidents of

alleged harassment rises to the level of severity we have

required" of plaintiffs claiming to have been subjected to a

hostile work environment.  *Lauderdale*, 512 F.3d at 163.

Nevertheless, the court found that the plaintiff had presented

sufficient evidence to survive summary judgment because the

supervisor's many phone calls to the plaintiff (ten to fifteen

calls per shift) constituted *pervasive* harassment:

> Though [plaintiff] does not assert that each phone call
> carried sexual overtones, the frequency of unwanted
> attention, over a four-month time period, amounts to
> pervasive harassment.  Given this pervasiveness, the level
> of severity necessary to establish an altered work
> environment is diminished and [the supervisor's] invitation
> to [plaintiff] to "snuggle" in Las Vegas, the physical act
> of pulling her to himself, and the repeated requests to get
> coffee after work all satisfy the requirement.

*Id.* at 164.

Although the harassment in this case was marginally less

pervasive than the harassment in *Lauderdale*, it was more severe.

The *Lauderdale* supervisor's phone calls were fairly tame: he

asked her out on numerous occasions; he asked her if she was

married; he told her that she was beautiful and that he loved

her; and he suggested that the two of them could travel to Las Vegas and "snuggle." *Id.* at 161. There is no indication that any of the supervisor's remarks were obscene or threatening. On one occasion, the supervisor grabbed the plaintiff's handcuff case, "which she wore in the middle of her back on her belt, and pulled her to himself. Her lower back touched his stomach before she jerked away from him." *Id.* at 161-62. Although this latter incident was arguably more severe than the display of pornographic images to which Adams was subjected, a reasonable jury could find that the overall course of the *Lauderdale* supervisor's conduct was significantly less severe, and only slightly more pervasive, than the conduct in this case. As such, it would not be unreasonable for a jury to conclude that the harassment in this case affected a term, condition, or privilege of Adams's employment. *See Patane*, 508 F.3d at 114 (holding that the plaintiff stated a hostile work environment claim when she alleged that she regularly observed her supervisor watching pornographic videos; that she was regularly required to handle pornographic videotapes in the course of performing her employment responsibilities of opening and delivering the supervisor's mail; that she once discovered that hard core pornographic websites had been viewed on her own workplace computer; and that the supervisor had harassed a different employee many years earlier).

Two other points deserve mention. First, Greta argues that there is no evidence that "any pornographic material was directed to [Adams] or meant for [Adams] to view." R. Doc. 25-3 at 15. This may be true, but it does not mean that Adams's work environment was not hostile. As the Fifth Circuit and other courts have long recognized, sexually degrading comments and actions can create or contribute to a hostile work environment even when they are not specifically directed at the plaintiff. *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477-78 (5th Cir. 1989); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335-37 (6th Cir. 2008); *Yuknis v. First Student, Inc.*, 481 F.3d 552, 553-55 (7th Cir. 2007); *Patane*, 508 F.3d at 114.

Second, Greta argues that it cannot be held liable because it took prompt remedial action when it first learned of Royal's activities in December of 2006. *See* R. Doc. 25-3 at 15-16. There is some confusion in the briefs about the significance of this evidence. Gretna suggests that summary judgment must be granted because Adams cannot prove that the City "knew or should have known of the harassment and failed to take remedial action." *Id.* at 13. As the Court has already explained, however, a plaintiff asserting that her supervisor was responsible for creating the allegedly hostile work environment need not prove that her employer was negligent. *See Aryain*, 534 F.3d at 479 n.4; *Watts*, 170 F.3d at 509.

-14-

Gretna's remedial actions may nevertheless be relevant to
its ability to establish the *Ellerth*/*Faragher* affirmative
defense, which allows an employer to avoid vicarious liability in
certain cases if it can prove: "(a) that [it] exercised
reasonable care to prevent and correct promptly any sexually
harassing behavior, and (b) that the plaintiff employee
unreasonably failed to take advantage of any preventive or
corrective opportunities provided by the employer or to avoid
harm otherwise." *Faragher*, 524 U.S. at 807. Gretna asserted
that defense in its answer, *see* Answer, R. Doc. 5 at 4, and
indicated at the June 9, 2009 pre-trial conference that its
reference to prompt remedial action in its brief was intended to
be an invocation of the defense. Because of the confusion on
this issue, the Court granted the parties extra time to submit
supplemental briefing. The Court will therefore defer its final
ruling on the hostile work environment claim until the parties'
supplemental briefs have been submitted.

**B.    Retaliation**

In addition to prohibiting sex-based discrimination in
employment, Title VII prohibits employers from retaliating
against an employee who "has opposed any practice made an
unlawful employment practice by this subchapter." 42 U.S.C.
§ 2000e-3. When, as here, the plaintiff seeks to prove

retaliation through circumstantial evidence, the court must apply

the burden-shifting framework recognized by the Supreme Court in

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  *See Septimus v.*

*Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).  First, the

plaintiff must make out a prima facie case of retaliation by

proving that:

> (1) She engaged in an activity protected by Title VII;
>
> (2) The employer took an adverse employment action against
>     her; and
>
> (3) A causal connection exists between the protected
>     activity and the adverse employment action.

*Aryain*, 534 F.3d at 484; *see also Burlington Northern & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (holding that the

retaliation provision of Title VII protects workers from conduct

that would "dissuade[] a reasonable worker from making or

supporting a charge of discrimination").  If the plaintiff

carries her burden, a presumption arises that the employer

unlawfully retaliated against her.  *Cf. Texas Dept. of Community*

*Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The defendant, in

turn, may rebut this presumption by articulating a "legitimate,

nondiscriminatory reason" for its decision.  *Strong v. University*

*Healthcare System, LLC*, 482 F.3d 802, 805 (5th Cir. 2007).

Finally, if the defendant produces evidence of a

nondiscriminatory reason for the adverse action, the burden

shifts back to the plaintiff to prove that "the employer's stated

reason for the adverse action was merely a pretext for the real, retaliatory purpose." *Septimus*, 399 F.3d at 608.

Adams has alleged that Gretna retaliated against her for reporting Royal's behavior. She claims that the Mayor called her into his office shortly after she reported Royal's behavior and "proceeded to scold [her] and tell [her] that [she] should have been a big girl and should have dealt with [the situation herself]." Adams Depo. at 234. Around the same time, a superintendent in the Public Utilities department named Andy McMenamin began to "constantly supervise[]" Adams. R. Doc. 40 at 6. According to Adams, McMenamin would "sit in [her] office, silently watching her actions. He would often call her, wanting to know where she was and when she was coming to work." *Id.* at 7; *see also* Adams Depo. at 216-20. One and one-half months after Royal resigned, Gretna terminated Adams's employment.

As Adams's counsel confirmed at the June 9, 2009 pre-trial conference, Adams is asserting two separate retaliation claims: one relating to McMenamin's alleged surveillance and one relating to Adams's eventual termination. Gretna apparently did not understand the McMenamin allegations to constitute a freestanding retaliation claim, and it devotes relatively little attention to that issue.[2] It does not address whether McMenamin's behavior

_____

[2] Gretna's confusion on this point is understandable. Adams herself appears to have been confused about the boundaries between her different claims. *See, e.g.*, R. Doc. 29 at 17-22

was sufficiently egregious to "dissuade[] a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 68, nor does it directly address whether there is a causal link between Adams's complaint and McMenamin's supervision.  Gretna does argue that Adams cannot prove that her allegations about McMenamin's behavior are true, *see* R. Doc. 25-3 at 18, but Adams's sworn testimony in support of her position is sufficient to create a genuine issue of fact on this point, *see* Adams Depo. at 216-20.  Because Gretna has not explained why it is entitled to summary judgment on Adams's first retaliation claim, the Court must deny Gretna's motion as to that issue.

Gretna does not directly challenge the first and second elements of Adams's *prima facie* case on the retaliatory termination claim.  With respect to the third element, Gretna argues that Adams "has presented no evidence of a causal link between her complaint against Royal and her termination, other than close timing."  R. Doc. 32 at 4.  But "temporal proximity alone, when very close, can in some instances establish a *prima facie* case of retaliation."  *Strong*, 482 F.3d at 808.  Gretna's argument here goes to the ultimate issue of what evidence Adams must submit in order to show that she would not have been fired

(conflating hostile work environment and retaliation claims). Nevertheless, the Court is restricted in its review to issues that Gretna has identified as proper grounds for summary judgment. *See Celotex*, 477 U.S. at 323; *Russ*, 943 F.2d at 591-92.

"but for" her protected conduct.  Although the similarity between
the language used to describe the "causal link" element of a
plaintiff's *prima facie* case and the language used to describe
the ultimate issue of what caused the employer to take an adverse
employment action can understandably lead to confusion, the Fifth
Circuit has clearly distinguished between the two issues.
Whereas pure temporal proximity is never sufficient to prove "but
for" causation, it may be sufficient to raise an inference of
retaliation by establishing a "causal link" between the protected
conduct and the adverse employment action.  *See id.*  Because
Gretna has not presented argument with respect to the elements of
Adams's *prima facie* case, the Court assumes that Adams has
carried her initial burden and turns to the second and third
steps of the *McDonnell Douglas* analysis.

　　With respect to Adams's termination, Gretna set forth five
legitimate reasons for its decision in the letter informing Adams
of her termination.  Adams has attempted to show that each of
these reasons was false.  First, Gretna claimed that Adams failed
to respond to a request from the Mayor for particular
information.  *See* R. Doc. 29-4 at 1.  Adams denies that the Mayor
ever made such a request.  Adams Decl., R. Doc. 29-3 at 1.
Second, Gretna claimed that Adams misrepresented facts during an
interview with the Mayor.  *See* R. Doc. 29-4 at 1.  Adams denies
ever making the statement in question.  Adams Decl., R. Doc. 29-3

at 1.  Third, Gretna claimed that Adams was disrespectful to city councilman Vincent Cox during a phone conversation.  *See* R. Doc. 29-4 at 1-2.  Adams denies that she raised her voice or was otherwise disrespectful.  Adams Decl., R. Doc. 29-3 at 2.  Adams has also submitted the declaration of her mother, who overheard the conversation and avers that Adams "never used disrespectful, inappropriate, or vulgar language."  Cynthia Adams Decl., R. Doc. 29-6 at 1.  Fourth, Gretna claimed that the Cox incident "made [the City Administration] aware that rental fees were being paid [for the use of a city facility] and upon investigation found no revenue sent to City Hall for deposit."  R. Doc. 29-4 at 1-2.  The implication appears to be that Adams was improperly routing the rental fees.  Adams denies ever having "dealt with revenue from rentals."  Adams Decl., R. Doc. 29-3 at 2.  Finally, Gretna claimed that Adams spoke harshly with her new supervisor, Jack Griffin, regarding McMenamin's actions.  R. Doc. 29-4 at 2.  Adams avers that she "was not harsh with Jack Griffin but upset and shaken that Andy McMenamin continued to act toward me in a menacing and unexplained fashion."  Adams Decl., R. Doc. 29-3 at 2.

The Court finds that Gretna has satisfied its burden of proffering a legitimate, nondiscriminatory reason for Adams's termination.  The burden now shifts back to Adams to prove that Gretna's stated reasons are pretextual.  At this stage, "the only

question on summary judgment is whether the evidence of retaliation, in its totality, supports an inference of retaliation." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999).

As noted above, Adams has attempted to cast doubt on Gretna's stated reasons through her sworn declaration. She has specifically denied or provided a different account of each of Gretna's proffered nondiscriminatory reasons. In addition, Adams has testified that the Mayor called her into his office shortly after she reported Royal's behavior and "proceeded to scold [her] and tell [her] that [she] should have been a big girl and should have dealt with [the situation herself]." Adams Depo. at 234. The Court finds that this evidence is sufficient to defeat Gretna's motion for summary judgment. If a jury were to believe all of Adams's testimony, it could reasonably conclude that Gretna's stated reasons for terminating her were pretextual and that Gretna's true motivation was to retaliate against Adams. *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Shackelford*, 190 F.3d at 409 ("[T]he combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment.").

Unlike recent cases in which the Fifth Circuit has affirmed summary judgment for the defendant, Adams has presented evidence that goes beyond mere subjective belief and speculation. *Compare, e.g., Aryain*, 534 F.3d at 487; *Strong*, 482 F.3d at 808; *Septimus*, 399 F.3d at 611. She has presented evidence that, if believed, affirmatively shows that Gretna's proffered reasons for terminating her were false. *See* Adams Decl., R. Doc. 29-3 at 1-2; *see also* R. Doc. 40 at 1-4 (presenting evidence to show that Jack Griffin's testimony regarding complaints he had received about Adams was untrue). In addition, she has testified that the Mayor of Gretna, who was ultimately responsible for her termination, harassed and belittled her regarding her protected conduct. Taking all of this evidence together, and viewing it in the light most favorable to Adams, the Court finds that it would not be unreasonable for a jury to conclude that Gretna terminated Adams in retaliation for reporting Royal's behavior. Summary judgment must therefore be denied as to Adams's retaliation claim.

### C.    After-Acquired Evidence

In addition to directly challenging Adams's retaliation claim, Gretna argues that Adams's "recovery should be barred" because newly discovered evidence provides an independently sufficient ground for her termination. R. Doc. 25-3 at 20. Both

parties' briefing on this issue is wanting.  In light of the
continuance of the trial date, the parties may submit
supplemental briefing so that the issue of after-acquired
evidence can be resolved appropriately.

**D.  Due Process**

Finally, Adams claims that Gretna deprived her of liberty
without due process of law by publicly disclosing the reasons for
her termination without giving her an opportunity to clear her
name at a hearing.[3]  To prevail on this sort of due process
claim, a plaintiff must show:

(1)  that she was discharged;

(2)  that stigmatizing charges were made against her in
     connection with the discharge;

(3)  that the charges were false;

(4)  that she was not provided notice or an opportunity to
     be heard prior to the discharge;

(5)  that the charges were made public;

(6)  that she requested a hearing to clear her name; and

(7)  that the employer denied the request.

*Bledsoe v. City of Horn Lake*, 449 F.3d 650, 653 (5th Cir. 2006).

Gretna argues that Adams has failed to present evidence in
support of the second and fifth elements.  *See* R. Doc. 32 at 7-8.

_____

[3] Although Adams alleged in her complaint that she was also
deprived of a property interest, *see* Compl., R. Doc. 1 at ¶ 11,
she has apparently abandoned this claim, *see* R. Doc. 29 at 13-17.

With respect to the fifth element, Gretna points out that the charges against Adams were never made public. Adams herself admits that the allegedly stigmatizing charge was made in a private letter, enclosed in an envelope, that Jack Griffin personally handed to her. R. Doc. 29 at 15. Although Adams argues that she was subjected to public humiliation when police officers escorted her to her office and as she loaded her belongings to her vehicle in the rain, there is no indication in the record that Gretna made the reasons for her discharge public during that episode or at any other time.

Adams's argument in support of her position boils down to her claim that Gretna chose to "make a public spectacle of what should otherwise have been a private transaction between the parties." R. Doc. 40 at 8. But "a constitutionally protected liberty interest is implicated only if an employee is discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *Hughes v. City of Garland*, 204 F.3d 223 (5th Cir. 2000) (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)). Because Adams has presented no evidence that Gretna ever made the reasons for her termination public, summary judgment must be granted for Gretna on this issue. *See id.* at 228 (affirming entry of summary judgment for the defendant on the ground that, *inter alia*, plaintiff's evidence "that some people

in the community heard rumors about the events leading up to her discharge" fell "well short of 'intentional or official' disclosure" by the defendant).

## IV.  CONCLUSION

For the foregoing reasons, Gretna's motion for summary judgment is GRANTED in part and DENIED in part.


New Orleans, Louisiana, this 12th day of June, 2009.


_____
        SARAH S. VANCE
  UNITED STATES DISTRICT JUDGE